UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JULIE A. SU, ACTING SECRETARY OF   :
LABOR, UNITED STATES DEPARTMENT OF :
LABOR,                             :
                                   :
        Plaintiff,                 :
                                   :
v.                                 :   Case No. 2:23-cv-560
                                   :
BEVINS & SON, INC., TIFFANY        :
CREAMER, and BRYAN A. BEVINS,      :
                                   :
        Defendants.                :

## OPINION AND ORDER

Plaintiff Julie A. Su, acting Secretary of the United States Department of Labor ("DOL"), filed this action against Bevins & Son, Inc., Tiffany Creamer, and Bryan Bevins ("Defendants"), alleging that they unlawfully retaliated against employees who received back wages after reaching a settlement with DOL. ECF No. 1 at 1. Defendants filed a motion to dismiss, ECF No. 7, and DOL filed a motion to amend its complaint. ECF No. 16. For the following reasons, Defendants' motion to dismiss is **denied.** DOL's motion to amend is also **denied.**

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Defendant Bevins & Son is a Vermont construction and excavation business "with a principal business address" in Milton, Vermont. ECF No. 1 at 4. Tiffany Creamer is Bevins &

Son's secretary and treasurer, and Bryan Bevins is its president. *Id.*

Riley Bockus, an alleged victim of Bevins & Son's retaliation, began working for the company in March of 2021. ECF *Id.* DOL asserts that Bockus "was an employee of Bevins & Son, as defined by" 29 U.S.C. § 203(e) for the duration of his employment. *Id.* He "sometimes" worked more than 40 hours per week while employed at Bevins & Son, entitling him to overtime pay under the FLSA. Bryan Bevins allegedly took issue with how Bockus calculated his time worked, and "on or about September 26, 2022," omitted "one and one-half overtime hours" from Bockus' paycheck. *Id.* at 7. Bockus and Bevins then had a text exchange about the missing hours, during which Bockus stated "[i]if you don't want to be fair and pay my hours working I will call the labor board." *Id.* at 8.

Later that same day, Bockus and Bevins had a face-to-face conversation about these overtime hours. During that conversation, Bevins "expressed displeasure with Bockus's prior statements that Bockus would call the 'labor board' or the Department of Labor." *Id.* Bevins then fired Bockus, who promptly filed a complaint with DOL's Wage and Hour Division ("WHD") concerning Bevins & Son's pay and employment practices. *Id.* at 8-9.

On September 27, 2022, following Bockus' complaint, WHD "initiated an investigation into Bevins & Son's compliance with the FLSA." *Id.* at 9. Over the course of that investigation, WHD gathered information from Bockus and several other employees including text message communications with Bevins and general information regarding Bevins & Son's typical practices. *Id.* Bevins conducted an interview with WHD and allegedly admitted "being aware prior to discharging Bockus that Bockus had mentioned the possibility of calling [DOL] concerning Bevins & Son's pay practices." *Id.* at 10. Bevins also apparently admitted that he felt "sick of Bockus threatening to call" DOL. *Id.* (cleaned up).

This investigation led to a settlement agreement. Bevins & Son agreed to pay 17 employees – including Bockus and Tyler Andersen – roughly $17,000 in back wages and liquidated damages. *Id.* It also paid Bockus an additional $3,310 in back pay and $25,000 in punitive damages as compensation for his allegedly unlawful discharge. *Id.* The settlement agreement also contained a provision in which Bevins & Son promised not to "discriminate against or discharge any employee for participating in any proceeding or asserting any rights guaranteed" to an employee under the FLSA. *Id.* at 11.

On May 31, 2023, DOL issued a press release stating that Bevins & Son terminated a worker (unnamed in the release) for

"asking to be paid in compliance with the FLSA." *Id.* It also "generally described the terms of the Settlement Agreement, including the amounts paid to employees," without naming any employees. *Id.* at 12. The press release was picked up by local news station WCAX-TV, which aired a TV news segment and published an online story concerning DOL's investigation. WCAX summarized the press release without using the names of any employees. *Id.* at 12.

> Defendant Creamer then posted the following on Facebook:
>
> To anyone who saw and watched the WCAX news cast on our business. All we are going to say is please google the disgruntled employee whom was fired and contributed to the story Riley Bockus (his word and character will be seen). That's not the whole story & that's not what the findings were… WCAX did NOT and has not reached out to us in regards to the bullshit story they just aired. Lawyers are involved… All that know Bevins & Sons knows what kind of business we run and what we stand for! Thank you for supporting us. . . . We are still hiring [emoji] & ALWAYS do your do diligence when hiring someone.

ECF No. 1-3 at 2. Multiple people responded to Creamer's Facebook post, including one comment that included a screenshot of a Google search showing that Bockus had engaged in criminal activity. Defendant Creamer responded "point made" to this comment. ECF No. 1-4 at 2. Several other comments also alleged that Bockus engaged in criminal activity. Defendants Bevins and Creamer "liked" several of those comments. ECF No. 1 at 13. DOL also alleges that several individuals "shared Defendant

Creamer's public post targeting Bockus on their own Facebook accounts." *Id.* at 14.

Plaintiffs also state that one individual commented on a post sharing the WCAX story inquiring whether the employees who received the $17,000 were "wrong." ECF No. 1 at 14. Defendant Bevins allegedly replied to this comment with the following:

> [T]rue story, I did have to pay that $17,000. And all those employees were already paid for all those hours driving a truck. I just didn't have record of them driving. Let's just say that my employees are great and most of that money came back to me!

*Id.* DOL alleges that Bevins intended to "create an impression that Bevins & Son's employees who received back wages and liquidated damages under the Settlement Agreement . . . had returned that money to Bevins & Son because Defendant Bevins wanted to upset Bockus." *Id.* at 15. It states that Bevins knew that his comment was public, and that Bevins was Facebook friends with multiple employees that received money as a result of the settlement. *Id.* DOL also submits that Bevins believed Bockus had spoken to WCAX about the WHD investigation and settlement. *Id.*

Finally, DOL seeks to amend its complaint, adding allegations that Defendants' online conduct towards Tyler Andersen — another former employee — also evinces retaliation. Andersen worked at Bevins & Son until June of 2021. ECF No. 16-1 at 11. He received back wages for unpaid overtime in the WHD

settlement. *Id.* at 12. After WCAX published its story about the
settlement, Andersen's spouse allegedly shared a link to the
story on Facebook. "Within the hour, Defendant Creamer responded
on Facebook" to Andersen's spouse's post, apparently saying
"[g]ood share . . . Hold on while I share and repost all the
stories about your family killing chickens and dogs along with
all the other articles." *Id.* at 15. Andersen's spouse replied
that they were not seeking "drama," and Creamer stated "you were
looking for drama by sharing it – give me a break! I'm not
looking for drama either as I post all the stuff about your
husband and you that others have posted. So please don't take it
personally . . . hold on a sec as I find it." *Id.* at 15-16
(cleaned up). Andersen's spouse then deleted the original post
linking to the WCAX piece. *Id.* at 16.

### B. Procedural Background

DOL filed this action on October 26, 2023. ECF No. 1. The
initial complaint focused solely on Defendants' allegedly
retaliatory actions against Bockus. Defendants filed a motion to
dismiss on December 28, 2023, ECF No. 7, and DOL responded on
February 16, 2024. ECF No. 13. On March 8, 2024, DOL moved to
amend its Complaint, seeking to add facts about the allegedly
retaliatory actions against Andersen in support of its sole
count seeking injunctive relief, punitive damages, and
litigation costs stemming from Defendants' claimed retaliation.

6

ECF No. 16. Defendants responded on March 22, 2024, arguing that the Proposed Amended Complaint failed to state a claim. ECF No. 18. Defendants' motion to dismiss and DOL's motion to amend are now ripe.

**DEFENDANTS' MOTION TO DISMISS**

**A. Legal Standard**

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

In deciding a motion to dismiss filed under Rule 12(b)(6), a court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, a court need not accept as true "[l]egal conclusions, deductions or opinions couched as factual

allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

## B. Analysis

The Fair Labor Standards Act ("FLSA") authorizes the Secretary of Labor to seek injunctions remedying "alleged violations of section 215(a)(3) . . . of this title." 29 U.S.C. § 216(b). Section 215(a)(3), in turn, makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).

FLSA retaliation claims are analyzed under the three-step burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010). The plaintiff must first establish a *prima facie* case of retaliation by showing "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins* 626 F.3d at 53. If the plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate, non-retaliatory reason for the action. *Id.* If the defendant does so, "the plaintiff must produce sufficient evidence to permit a reasonable juror to

8

find that the defendant's proffered explanation was pretextual."
*Id.* At the pleadings stage, though, "the Court does not
specifically apply the *McDonnell Douglas* burden-shifting test to
determine whether Plaintiff has stated a retaliation claim, but
rather generally assesses the plausibility of Plaintiff's claim
based on the facts alleged in the Complaint." *Jian Zhong Li v.
Oliver King Enterprises, Inc.*, No. 14-CV-9293 VEC, 2015 WL
4643145, at *2 (S.D.N.Y. Aug. 4, 2015) (quoting *Brundidge v.
Xerox Corp.*, No. 12-CV-6157, 2014 WL 1323020(FPG), at *3
(W.D.N.Y. Mar. 31, 2014)). For purposes of Defendants' motion to
dismiss, DOL's claims may proceed if they make out a *prima facie*
showing of retaliation.

Defendants raise a threshold question: whether their speech
was protected by the First Amendment. ECF No. 7 at 5. The Court
will first address that issue and will then evaluate whether the
two allegedly retaliatory incidents from the initial Complaint –
Creamer's discussion of Bockus and Bevins' statement that he was
repaid the settlement money – qualify as unlawful retaliation.

1. First Amendment

Defendants argue that their Facebook comments "were an
expression of [Defendants'] sentiments and grievances
concerning" the WHD investigation and are therefore protected by
the First Amendment. Few courts have addressed the narrow issue
of when the First Amendment protects employers' speech from FLSA

9

retaliation claims. The Court concludes that an employer's
speech is not protected by the First Amendment if it is an
adverse employment action taken against an employee who engaged
in conduct protected by the FLSA.

The Supreme Court addressed a similar issue in *NLRB v.
Gissel Packing Co.* ("*Gissel*"), 395 U.S. 575 (1969). In that
case, the Court evaluated whether (and when) employer "antiunion
campaigns" were entitled to First Amendment protection from
prosecution for "unfair labor practice[s]" under the National
Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1). *Gissel*, 395
U.S. at 616-20. The Court explained that the First Amendment
protects an employers' right to make specific predictions about
the effects of unionization on the business. *Id.* at 617. ("[A]n
employer's free speech right to communicate his views to his
employees is firmly established."). But it also noted that the
NLRA allowed employers to communicate its "general views about
unionism [and] specific views about a particular union, so long
as the communications" did not contain a "threat of reprisal or
force or promise of benefit in violation of § 8(a)(1)." *Gissel*,
395 U.S. at 618 (citing 29 U.S.C. § 158(c)) (quotations
omitted).

In other words, the Court noted that the NLRA "merely
implement[ed] the First Amendment" by establishing that only
limited categories of speech – threats of reprisal, force, and

10

promise of benefit – could be prosecuted as unfair labor practices. *Id.* It explained that in constructing such a framework, Congress balanced employers' and employees' speech rights, taking into account "the economic dependence of the employees on their employers." *Id* at 617-18. It condoned this framework, explaining that employers may communicate general and specific views so long as they do not contain a "threat of reprisal or force or promise of benefit." *Id.* at 618. It also explained that the employer may not imply that it would act in response to unionization "solely on [its] own initiative for reasons unrelated to economic necessities." *Id.* Such a threat of discretionary sanction would turn the statement into "a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment." *Id.*

*Gissel* reveals that employer statements designed to punish or otherwise unlawfully influence employees are generally not subject to First Amendment protection. *See also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983) (holding that while employers have a constitutional right to file counterclaims against employees, "baseless litigation is not immunized by the First Amendment right to petition"). That result is supported by case law in this Circuit. First, at least one other court has held that an employer "has no First Amendment right to engage in retaliatory conduct prohibited

11

under the FLSA." *Centeno-Bernuy v. Perry*, 302 F. Supp. 2d 128, 139 (W.D.N.Y. 2003) ("Perry has no constitutional right to make baseless accusations against plaintiffs to government authorities for the sole purpose of retaliating against the plaintiffs for filing the Becker Farms litigation."). Second, the Second Circuit recently reiterated that pursuant to *Gissel*, the First Amendment does not protect an employers' questioning of an employee if the words used or the context in which they are used "suggest an element of coercion or interference." *Bozzuto's Inc. v. NLRB*, 927 F.3d 672, 684 (2d Cir. 2019) (citing *Rossmore House*, 269 NLRB 1176, 1177 (1984)). It also noted that determination of whether questioning is unduly coercive depends on various factors, ultimately going to the question of "whether under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the [NLRA]." *Id.* (quoting *Rossmore House*, 269 NLRB at 1178 n.20).

An employer's retaliatory speech against an employee that has engaged in protected activity under the FLSA is unprotected if that speech "discriminate[s] against any employee because such employee has filed any complaint or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). If the speech is retaliatory under the FLSA, it is not protected by the First Amendment. This conclusion is supported by the Supreme Court's guidance in *Gissel*, which held

that while employers have a First Amendment right to speak on
unionism and benefits of specific unions, they may not engage in
coercive or retaliatory tactics. 395 U.S. at 618. As the Second
Circuit explained, making this determination requires
consideration of the "totality of the circumstances." *Bozzutto's
Inc.*, 927 F.3d at 684. The fact that retaliation comes in the
form of speech does not entitle it to special protection.
However, if the speech does not "discriminate" against an
employee because that employee has engaged in conduct protected
by the FLSA, the employer is entitled to the robust protections
typically afforded by the First Amendment. The Court will apply
this framework to each incident below.

   2. Facebook Post About Bockus

   DOL has made out a *prima facie* case of retaliation with
regard to Creamer's Facebook post stating "please google the
disgruntled employee whom was fired and contributed to the story
Riley Bockus (his word and character will be seen)." ECF No. 1-3
at 2. First, it has alleged that Bockus engaged in protected
activity. The Complaint states that when Bockus realized that
Bevins had omitted one-and-a-half hours of overtime from his
pay, Bockus expressed his belief as to when he formally began
work, and said "[i]f you don't want to be fair and pay my hours
working I will call the labor board." ECF No. 1 at 8. The Second
Circuit has held that complaints to employers qualify as

protected activity for retaliation purposes. *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 116 (2d Cir. 2015).[1] The Complaint also notes that Bockus filed a complaint with the WHD, another protected activity under the FLSA. *Hyunmi Son v. Reina Bijoux, Inc.*, 823 F. Supp. 2d 238, 242 (S.D.N.Y. 2011) ("[T]he filing of formal complaints to a government authority is protected under the FLSA."). Bevins does not dispute that Bockus engaged in protected activity. *See* ECF No. 7 at 11.

The Second Circuit has explained that "[a]n employment action disadvantages an employee if 'it well might have dissuaded a reasonable worker from making or supporting similar charges.'" *Mullins*, 626 F.3d at 53 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). This is an objective determination, hinging on whether a "reasonable employee" would be deterred by the employer's conduct. *Burlington N.*, 548 U.S. at 68. Bevins does not dispute that the FLSA's protections apply to current and former employees. *See*

---

[1] The Second Circuit noted that "[i]n some circumstances, an employer may find it difficult to recognize an oral complaint as one invoking rights protected by FLSA." *Greathouse*, 784 F.3d at 116. It went on to explain that "a complaint is 'filed' [only] when a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act." *Id.* (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)). Drawing all reasonable inferences in favor of DOL, as the Court must at this stage of the litigation, Bockus' statement that he would "call the labor board" served to put Bevins on notice that Bockus was "asserting statutory rights under the" FLSA. *Id.*

*Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008) (concluding that the FLSA's protections extend to former employees); *Han v. Shang Noodle House, Inc.*, No. 20CV2266PKCVMS, 2022 WL 4134223, at *7 (E.D.N.Y. Sept. 12, 2022) ("[D]istrict courts in this Circuit have" held that the term "employees" includes former employees). However, courts in this Circuit have explained that post-employment retaliation may be found "under relatively narrow circumstances." *Porter v. MooreGroup Corp.*, No. 17-cv-7405 (KAM)(VMS), 2020 WL 32434, at *11 (E.D.N.Y. Jan. 2, 2020) (cleaned up).

Those narrow circumstances encompass post-employment disparagement, as the Second Circuit explained in *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("The terminated employee [] may have tangible future employment objectives, for which he must maintain a wholesome reputation. Thus, plaintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company [if] the company 'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation.") (cleaned up). Several district courts in the Second Circuit have reached similar conclusions in recent cases. In *Stih v. Rockaway Farmers Market, Inc.*, the court found that an employer's statement to another former employee that the plaintiff was a "criminal" demonstrated

15

actionable retaliation because the statement had "the effect of damaging [the plaintiff's] reputation within his industry of employment." No. 22-CV-3228-ARR-RER, 2023 WL 2760492, at *6 (E.D.N.Y. Apr. 3, 2023). Similarly, in *Han v. Shang Noodle House, Inc.*, the court held that an employer's Tiktok video stating in part "[w]hoever owns restaurants in the United States, please do not hire" the plaintiff "clearly constitute[d] disadvantageous post-employment conduct" because it diminished the plaintiff's future employment prospects. 2022 WL 4134223 at *7.

Creamer's Facebook post qualifies as an adverse "employment action" for two reasons. First, public disclosure of Bockus' identity and status as the FLSA complainant – especially when not otherwise revealed by public documents, such as the settlement or WCAX news story – might "dissuade[] a reasonable worker from making or supporting similar charges." *Mullins*, 626 F.3d at 53. Drawing all reasonable inferences in favor of DOL, public exposure might plausibly tarnish Bockus' reputation and make it more difficult for him to find employment. Second, Creamer's post did more than simply identify Bockus: it also invited readers to investigate his background. ECF No. 1 at 13. And when another commenter replied with a screenshot indicating that Bockus "previously engaged in criminal activity," Creamer responded "point made," indicating that the "point" of the post

16

was to highlight Bockus' criminal record. ECF No. 1 at 13. DOL has, therefore, plausibly alleged that the effect of the post was to disparage Bockus, which qualifies as adverse employment action under the FLSA.[2] *See Stih*, 2023 WL 2760492, at *6; *Han*, 2022 WL 4134223, at *7.

Bevins characterizes Creamer's Facebook post as "making true statements about a former employee in an online posting," and argues that this does not qualify as an adverse employment action. The adverse element of the action is that neither the WHD press release nor the WCAX story mentioned Bockus, and Creamer's Facebook post highlighted Bockus as the "disgruntled employee" associated with the WHD complaint. ECF No. 1 at 13. Furthermore, Creamer's post solicited investigation of Bockus' background without Bockus otherwise implicated in the post. In other words, Creamer called unwanted attention to Bockus that plausibly sullied his reputation. The issue is not that Creamer made "true statements about a former employee in an online posting," but that she did so about a former employee who filed

---

[2] Defendants assert that they are insulated from liability by 47 U.S.C. § 230(c)(1), which provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." DOL's action is not based upon information provided by another content provider (e.g., the commenter). It is based upon Bevins' exposure of Bockus' identity, solicitation of investigation, and endorsement of his ostensible criminal activities.

an FLSA complaint without that employee being otherwise implicated in coverage of the underlying settlement, and without that employee's criminal background being otherwise relevant to the settlement or news story.

Further, even a true report of unlawful conduct can be considered unlawful retaliation under the FLSA. *See, e.g.*, *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 895 (1984) (employer committed an unfair labor practice by reporting undocumented employees to INS in retaliation for participating in union activities); *Aguilar v. E.C. Mgmt. Corp.*, No. 12-20678-CIV, 2012 WL 12875471, at *2 (S.D. Fla. July 17, 2012) ("]R]eporting a crime when . . . motivated by a retaliatory animus may be unlawful.").[3] This case is different from *Palma v. NLRB*, 723 F.3d 176 (2d Cir. 2013), in which the Second Circuit held that individuals not lawfully present in the United States could not receive backpay under the NLRA for their unlawful discharge when they were unlawfully hired in the first place, because there was nothing unlawful about Bockus' original employment.

DOL has plausibly alleged that the adverse action was taken because of Bockus' protected activity. Creamer's Facebook post

---

[3] The *Aguilar* court noted that subjecting employers to civil retaliation lawsuits from reporting crimes might deter reports of unlawful behavior. That concern is not at play in this case, because Bevins did not report any not-yet-charged unlawful conduct. Instead, Bevins' intent was simply to publicize information about Bockus' background.

directly references the WCAX report, and states that "all [Bevins is] going to say is please google the disgruntled employee whom was fired and contributed to the story Riley Bockus." ECF No. 1-3. In many ways, the post speaks for itself: it acknowledges the news report (and therefore the WHD settlement) and responds by naming Bockus and soliciting investigation of his background. DOL has satisfied the causation requirement for an FLSA retaliation claim.

Finally, the Court concludes that Creamer's Facebook post about Bockus is preliminarily unprotected by the First Amendment pending further factual development. As noted above, an employer's free speech right to comment upon matters that effect the business is firmly established. *Gissel*, 395 U.S. at 617. But when such commentary is "a threat of retaliation based on misrepresentation and coercion" it is "without the protection of the First Amendment." *Id.* at 618. DOL has plausibly alleged that Defendants' conduct was a threat of retaliation based on coercion. *Id.* Accordingly, it is plausibly unprotected.

3. Statement of Repayment

DOL also claims that Defendants retaliated against employees for protected activities when Defendant Bevins commented on Facebook that he had accepted repayment of back wages paid to employees under the settlement agreement. ECF No.

1 at 14-15. DOL asserts that this was retaliatory because "Defendant Bevins wanted to upset Bockus." ECF No. 15.

Defendants do not contest whether this statement was retaliatory in their motion to dismiss. *See generally* ECF No. 7 at 13. Their reply brief cursorily argues that DOL confuses "a potential claim for interference as opposed to retaliation," ECF No. 17 at 14, but the Court will not entertain new arguments raised in reply briefs. *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999). Discovery may proceed on this set of facts. The First Amendment defense is preliminarily denied for the same reason.

### DOL'S MOTION TO AMEND

**A. Legal Standard**

Rule 15 of the Federal Rules of Civil Procedure provides that parties shall be granted leave to amend their pleadings "when justice so requires." Fed. R. Civ. P. 15. The Supreme Court has explained that absent "undue delay, bad faith, or dilatory motive on the part of the movant," leave to amend should be freely given. *Foman v. Davis*, 371 U.S. 178, 182 (1962). A proposed amendment must plead sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678; *see also Long v. Parry*, 679 F. App'x 60, 63 (2d Cir. 2017). Whether to grant leave to amend is "within the sound

discretion of the district court." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

However, leave to amend should not be granted if amendment would be futile – in other words, if a "proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). The Second Circuit has explained that amendment should be allowed to preserve a substantively valid claim that has been "inadequately or inartfully pleaded." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). But when the defect with the claim is "substantive" and "better pleading will not cure it," leave to amend should be denied. *Id.* Accordingly, and because Defendants argue that DOL's Proposed Amended Complaint fails to state a claim, the Court will evaluate the Proposed Amended Complaint to determine whether it survives the 12(b)(6) standard.

**B. Analysis**

The factual allegations added in the Proposed Amended Complaint pertain only to Andersen, so the Court will evaluate whether those allegations state a plausible claim for retaliation under the FLSA. Plaintiffs claim that Andersen accepted back wages and liquidated damages pursuant to the WHD settlement and argue that this constitutes protected activity. ECF No. 16-1 at 11. The Court agrees. The Second Circuit has

"repeatedly affirmed that the remedial nature of the FLSA warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy." *Greathouse*, 784 F.3d at 113-14. While the FLSA's retaliation provision prohibits discrimination against employees because they have filed complaints, "instituted or caused to be instituted any [FLSA] proceedings," or testified in such proceedings, the Second Circuit has explained that "[p]rotection against discrimination for instituting FLSA proceedings would be worthless if an employee could be fired for declining to give up the benefits he is due under the Act." *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 879 (2d Cir. 1988). Consistent with this guidance, accepting FLSA settlement money – as well as refusing to return that money to an employer – qualifies as protected activity under the FLSA's anti-retaliation provision. *See Lawrence v. Sol G. Atlas Realty Co.*, No. 14CV3616DRHGRB, 2016 WL 7335612, at *6 (E.D.N.Y. Dec. 16, 2016) ("[T]he assertion that plaintiff was retaliated against for cashing the overtime check received as a result of the DOL investigation falls within the protection of the FLSA's retaliation protection.").

Andersen also suffered an adverse employment action. Creamer threatened to publicly share links to stories about Andersen's family engaging in unsavory behavior. ECF No. 16-1 at

15 (Creamer allegedly stating "[h]old on while I share and repost all the stories about your family killing chickens and dogs along with all the other articles."). Again, drawing all plausible inferences in favor of DOL, posting these stories might tarnish Andersen's reputation, making it difficult for him to find employment. As explained above, public dissemination of derogatory information like this could plausibly "dissuade[] a reasonable worker from" engaging in the same protected activity that Andersen engaged in: accepting money properly due under an FLSA settlement.[4] *Mullins*, 626 F.3d at 53.

Defendants raise two contrary arguments. First, they submit that Creamer's Facebook response is not actionable because it was made to Andersen's wife, who did not engage in protected FLSA activity. ECF No. 18 at 2-3. The Court disagrees that the allegedly retaliatory action was taken against Andersen's wife. Creamer threatened to post a troubling message about the

---

[4] Defendants argue that DOL has not shown an "employment action disadvantaging the plaintiff" because Defendants did not "threaten anyone's employment" or post a public message. As explained above, the standard for evaluating an adverse employment action is whether it "might have dissuaded a reasonable worker from making or supporting similar charges." *Mullins*, 626 F.3d at 53. This includes post-employment conduct that – while not classically employment-related, such as firing or demoting – may adversely impact the plaintiff's "future employment objectives." *Wanamaker*, 108 F.3d at 466. DOL has plausibly alleged that Defendants' threatened conduct may have negatively impacted the employees' future employment prospects, and that the threats may have dissuaded similar future complaints.

Andersen family, including Andersen himself. The fact that Andersen's wife received the message is irrelevant. Regardless, the Court agrees with DOL that retaliatory action – including threats – against close family members can qualify as retaliation under the FLSA. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) ("[A] reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiance would be fired.").[5] Second, Defendants argue that Creamer's statement was made in a private message to Andersen's wife, not on a public Facebook post, and that it was therefore somehow less retaliatory. ECF No. 18 at 2. The threatened action, though, was to publicly distribute negative information about the Andersens. It does not matter that the threat itself was made privately.

However, the Court concludes that, even drawing all plausible inferences in favor of DOL, Creamer's comment was not

---

[5] The Second Circuit has not spoken to this issue, but every other federal court to have considered the question agrees that retaliation against a close family member for another individual's protected activity qualifies as retaliation under the FLSA. *See, e.g.*, *Maier v. Priv. Mini Storage Manager, Inc.*, No. H-18-0991, 2019 WL 3753810, at *7 (S.D. Tex. Aug. 8, 2019); *Ornelas v. CD King Constr., LLC*, No. MO21CV00019DCRCG, 2021 WL 8444015, at *2 (W.D. Tex. Aug. 17, 2021), report and recommendation adopted, No. MO:21-CV-19-DC, 2021 WL 8444002 (W.D. Tex. Sept. 23, 2021); *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 649 (11th Cir. 2019) (theorizing that retaliation against a "close" third party might qualify under the FLSA).

caused by Andersen's protected activity under the FLSA.[6]
Regardless of whether the appropriate standard is "but-for"
causation or some reduced "motivated in part by" standard, DOL
has not alleged that Creamer's actions were taken in response to
Andersen accepting settlement money. Creamer allegedly sent the
threatening message after Andersen's wife posted a link to the
WCAX story on Facebook, but that message was motivated by the
Facebook post itself – not Andersen's acceptance of the
settlement money. DOL concedes this. ECF No. 16-4 at 9
("Creamer's threats were in response to Andersen's spouse
posting a link to an online news article discussing the"
settlement agreement). DOL does not allege that Creamer
conducted any threatening actions when Andersen accepted the
money, and instead only harassed the Andersens upon seeing the
repost of the WCAX story. *Cf. Mullins*, 626 F.3d at 53 (noting
that temporal proximity of the allegedly retaliatory action is
evidence of whether it was retaliatory). Posting the story – not
a protected activity under the FLSA – was the motivator
underlying the adverse action. *See* ECF No. 18 at 2 ("In response
to [Andersen's wife's post], Ms. Creamer sent a personal message
to Ms. Andersen.").

---

[6] The Second Circuit has not issued guidance on the causation
standard in FLSA retaliation claims. *See Fox v. Starbucks Corp.*,
No. 21-2531, 2023 WL 407493, at *1 n.1 (2d Cir. Jan. 26, 2023).

DOL nonetheless argues that Andersen accepting settlement money was a "but for" cause of the retaliation because "Creamer would have had no reason to threaten Andersen's family on Facebook if Andersen had not . . . claim[ed] the monies" that he was owed under the settlement. ECF No. 16-4 at 9 (citing *Bostock v. Clayton Cty., Ga.*, 590 U.S. 644, 656 (2020) ("[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.")). The Proposed Amended Complaint does not support this assertion. Adopting the methodology from *Bostock*, even if Andersen had not accepted the money, 16 others would have – and WCAX's story would have been substantially similar. Creamer likely would have threatened anyone who shared the story on Facebook, regardless of whether they accepted settlement money. It is impossible to know whether Andersen's wife would have shared the WCAX story, but the Proposed Amended Complaint does not state that she added any commentary about her husband's participation in the settlement, indicating that her post did not comment upon her husband's protected activity. Even drawing all reasonable inferences in favor of DOL, Andersen's actions were not a but-for cause of the retaliation. Creamer's message reacted to the Facebook post, not the protected activity. ECF No. 18 at 3 ("The communication in the amended complaint was a request by a

private person asking another private person to remove a link to a WCAX article.").

DOL argues that temporal proximity links Creamer's threat to Andersen to the other allegedly retaliatory activities, such as Creamer threatening Bockus and Bevins claiming kickbacks from employees. ECF No. 16-4 at 9. In support of this argument, DOL cites *Mullins* for the principle that causal connections can be demonstrated though evidence of retaliatory animus or by showing that "the protected activity was closely followed in time by the adverse action." *Mullins*, 626 F.3d at 53 (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)). But the temporal proximity here is between Creamer's nominally retaliatory actions toward Andersen and other allegedly retaliatory activities, not between protected action (accepting the settlement money) and retaliation.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (ECF No. 7) is **denied**. DOL's motion to amend (ECF No. 16) is also **denied**.

DATED at Burlington, this 7th day of May, 2024.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge